1   STEVEN G. SKLAVER (237612)
    ssklaver@susmangodfrey.com
2   KALPANA SRINIVASAN (237460)
    ksrinivasan@susmangodfrey.com
3   SUSMAN GODFREY L.L.P.
    1901 Avenue of the Stars, Suite 950
4   Los Angeles, CA 90067-6029
    Phone: (310) 789-3100
5   Fax: (310) 789-3150

6   MATHEW R. BERRY (*pro hac vice* to be filed)
    mberry@susmangodfrey.com
7   SUSMAN GODFREY L.L.P.
    1201 Third Avenue, Suite 3800
8   Seattle, WA 98101
    Phone:  (206) 516-3880
9   Fax: (206) 516-3883

10  (See Signature Page for Names and Addresses of
    Additional Counsel for Plaintiff)
11

12  Attorneys for Plaintiff Georgia Cano individually and
    on behalf of all others similarly situated

13              **UNITED STATES DISTRICT COURT**

14             **NORTHERN DISTRICT OF CALIFORNIA**

15                  **SAN JOSE DIVISION**

16

17

18  GEORGIA CANO, individually and on behalf of       CASE NO: 14-cv-4203
    all others similarly situated,
19                                                     <u>CLASS ACTION</u>
                    Plaintiff,
20                                                     COMPLAINT FOR VIOLATIONS OF
    v.                                                 SECTION 1 OF THE SHERMAN ACT, 15
21                                                     U.S.C. § 1; VIOLATIONS OF THE
    PIXAR; DREAMWORKS ANIMATION SKG,                   CARTWRIGHT ACT, Cal. Bus. & Prof.
22  INC., LUCASFILM LTD.; THE WALT                     Code §§16702, et seq.; and UNFAIR
    DISNEY COMPANY; DIGITAL DOMAIN 3.0                 COMPETITION, Cal. Bus & Prof. Code §
23  INC.; IMAGEMOVERS LLC;                             17200 et seq.]
    IMAGEMOVERS DIGITAL; SONY
24  PICTURES ANIMATION INC.; SONY                      <u>JURY TRIAL DEMANDED</u>
    PICTURES IMAGEWORKS INC.; BLUE SKY
25  STUDIOS, INC; and DOES 1 through 100,

26                  Defendants.

27

28

                                                       ANTITRUST CLASS ACTION COMPLAINT

Plaintiff GEORGIA CANO ("Plaintiff Cano"), individually and on behalf of all those similarly situated, by and through her counsel, brings this Class Action Complaint ("Complaint") against Defendants PIXAR; DREAMWORKS ANIMATION SKG, INC. ("Dreamworks"), LUCASFILM LTD. ("Lucasfilm"); THE WALT DISNEY COMPANY; DIGITAL DOMAIN 3.0 INC. ("Digital Domain"); IMAGEMOVERS LLC; IMAGEMOVERS DIGITAL ("ImageMovers"); SONY PICTURES ANIMATION INC.; SONY PICTURES IMAGEWORKS INC.; BLUE SKY STUDIOS, INC. ("Blue Sky"); and Does 1 through 100 (who collectively shall be referred to hereinafter as "Defendants"), on personal knowledge with respect to herself and her own acts, and on information and belief as to other matters, alleges as follows:

## I.      NATURE OF ACTION

1.      Plaintiff Cano, on behalf of herself, on behalf of the California general public, and as a class action on behalf of Defendants' employees and contractors who worked for Defendants no later than 2004 through the present ("Class Members"), seeks hundreds of millions of dollars in lost compensation, plus triple damages, caused by Defendants' long-standing, secret and illegal mutual anti-solicitation agreements that infected the entire digital animation industry and that had the intended and actual effect of significantly reducing Class Members' compensation for decades.  The genesis of the anti-solicitation and compensation-suppressing agreements at issue was a bilateral agreement originally entered into in the 1980s between George Lucas, the founder of Lucasfilm, Pixar President Ed Catmull and Pixar CEO Steve Jobs, but this bilateral anti-solicitation agreement metastasized over the years into an industry-wide wage-fixing cartel that included the Walt Disney Company, as well as the other named Defendants.

2.      This illegal conspiracy among and between Defendants to not actively recruit one another's employees in order to thereby suppress their compensation was fraudulently concealed for years and was not known, nor could it have been known, to Plaintiff and the Class Members until, at the earliest, in late 2010, when the Department of Justice ("DOJ") revealed as part of its then-pending investigation into similar illegal behavior by some of the largest technology companies in the world that Pixar, an animation company named here as a Defendant, had also engaged in *per se* violations of the Sherman Act by entering into anti-poaching and wage-fixing

1

3326665v1/102516

agreements with its competitors for the express purpose of depressing and/or reducing market-based compensation for Class Members that are typically associated with the active recruitment of employees and workers in a competitive industry. While protecting and enhancing their massive profits, Defendants through their anti-poaching agreements and wage-fixing agreements deprived Class Members of hundreds of millions of dollars worth of compensation for which Plaintiff and the Class now seek relief.

**II.  JURISDICTION AND VENUE**

3.     This Court has jurisdiction over the subject of this action pursuant to 15 U.S. C. §§ 4 and 16, as well as 28 U.S.C. §§ 1331 and 1337. This Court has supplemental jurisdiction over the claims brought under the laws of the State of California pursuant to 28 U.S.C. § 1367 since the matters at the heart of the Unfair Competition Claims form part of the same case or controversy.

4.     This Court has personal jurisdiction over Defendants because each resides in or has its principal place of business in the State of California, employed Class Members in California, and substantial parts of the anti-competitive conspiracies at issue took place in, originated in, or were implemented in whole or in part within the State of California. Defendants were at all times relevant hereto enterprises subject to the jurisdiction of the State of California and their conspiracy was largely entered into and carried out within the State of California.

5.     Venue as to each Defendant is proper in this judicial district, pursuant to 15 U.S.C. §§ 22 and 28 and 28 U.S. C. §1391(b)(1) and (2), because Defendants transact business and/or have transacted business during the relevant time period within the counties encompassed by the jurisdiction of the United States District Court for the Northern District of California. In addition, a substantial part of the acts giving rise to the claims set forth herein occurred in this judicial district, a substantial portion of the affected interstate trade and commerce was carried out in this district and in the San Jose Division. Furthermore, the underlying antitrust suit against several of the world's largest technology companies that revealed the existence of the anti-competitive and illegal behavior in the animation industry at the heart of the instant lawsuit is currently pending in the Northern District of California before the Honorable Judge Lucy Koh. Accordingly, pursuant

ANTITRUST CLASS ACTION COMPLAINT

to Civil Local Rule 3.2(c) and (e) and principles of judicial economy, this matter is appropriately brought within the San Jose Division.

**III.   THE PARTIES**

6.    Plaintiff Georgia Cano, who resides in California, is a former employee of several of Defendants, as well as several other animation companies.  Specifically, Plaintiff Cano was employed by Rhythm & Hues from December 1992 until January 2004 as a lighting technical director and supervisor and digital producer; by Sony Pictures Imageworks from February 2004 through September 2004 on "Polar Express", working with lighting and composition pipelines; by Walt Disney Feature Animation from October 2004 through October 2005 on "Meet the Robinsons", working with data organization and guidance for lighting; by Rhythm & Hues once again from June 2007 through November 2009 on "Alvin and the Chipmunks, "The Mummy", "Aliens in the Attic" and "Night at the Museum", working on refinements to software relevant to lighting issues; by Café FX from November 2009 through January 2010 working on "Alice in Wonderland"; by ImageMovers Digital from July 2010 through November 2010 on "Mars Needs Moms", working on lighting and compositing; by ICO VFX from December 2010 through June 2011 on "Harry Potter and the Deathly Hallows", working on producing 3D stereoscopic imagery; and by Double Negative Ltd. from September 2011 through November 2012 on "Skyfall" and "Total Recall", working on utilizing her raytracing experience while lighting environments and integrating CGI with live elements.  In sum, for over twenty years from 1992 through 2012, Plaintiff Cano worked as a digital artist involved in lighting, as well as software related to lighting and special effects, for a variety of animation companies, including several named Defendants.  As a result, she was victimized by the anti-solicitation conspiracy between and among the Defendants, resulting in her having lost compensation.

7.    Defendant Pixar is a California corporation with its principal places of businesses in California located at 1200 Park Avenue, Emeryville, California.  Since January 2006, Defendant The Walt Disney Company has owned Pixar.

8.    Defendant DreamWorks Animation SKG, Inc. ("Dreamworks") is a Delaware Corporation with its principal place of business located at 1000 Flower Street, Glendale,

ANTITRUST CLASS ACTION COMPLAINT

1   California. Dreamworks also operates and maintains a studio in Redwood City, California, in

2   Santa Clara County.

3       9.      Defendant Lucasfilm Ltd. ("Lucasfilm") is a California Corporation with its

4   principal places of business in California located at 1110 Gorgas Avenue, San Francisco,

5   California 94129.

6       10.     Defendant The Walt Disney Company is a Delaware Corporation with its principal

7   places of business in California located at 500 South Buena Vista, Street in Burbank, California.

8       11.     Defendant Digital Domain 3.0, Inc., also doing business as DD Digital Domain

9   3.0, Inc., is a Delaware Corporation with its principal places of business in California located at

10  300 Rose Avenue, Venice, California and 12641 Beatrice Street, Los Angeles, California.

11      12.     Defendant ImageMovers, LLC is a California Corporation with its principal places

12  of business in California located at 1880 Century Park East, Suite 1600 in Los Angeles,

13  California.

14      13.     Defendant ImageMovers Digital is a corporation of unknown origin with its

15  principal place of business located at PO Box 10428, San Rafael, CA 94912.  Prior to Janaury

16  2011, ImageMovers Digital's principal place of business was located at 9 Hamilton Landing,

17  Novato, California.

18      14.     Defendant Sony Pictures Animation, Inc. is a California Corporation with its

19  principal places of business in California located at 10202 W. Washington Blvd., Culver City,

20  California.

21      15.     Defendant Sony Pictures Imageworks, Inc. is a California Corporation with its

22  principal places of business in California located at 10202 W. Washington Blvd., Culver City,

23  California.

24      16.     Defendant Blue Sky Studios, Inc. is a Delaware Corporation with its principal

25  places of business in California located at 10201 West Pico Blvd., in Los Angeles, California.

26      17.     The true names and capacities, whether individual, corporate, associate, or

27  otherwise, of Defendants sued herein as DOES 1 to 100, inclusive, are currently unknown to

28  Plaintiff, who therefore sues Defendants by such fictitious names.  Plaintiff is informed and

4

believes, and based thereon alleges, that each of the Defendants designated herein as a Doe is legally responsible in some manner for the unlawful acts referred to herein in that they are additional co-conspirators.  Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of the Defendants designated hereinafter as Does when such identities become known. Defendants and the Does 1-100 shall collectively be referred to as "Defendants."

18.    Plaintiff is informed and believes, and based thereon alleges, that each Defendant acted in all respects pertinent to this action as the agent of the other Defendants, carried out a joint scheme, business plan or policy in all respects pertinent hereto, and the acts of each Defendant are legally attributable to the other Defendants.   Furthermore, Defendants in all respects acted pursuant to the mutual anti-solicitation agreements that were intended to suppress and had the effect of suppressing compensation for the Class Members.

## IV.    FACTS EVIDENCING THE CONSPIRACY

19.    Pixar and Lucasfilm, now both owned by The Walt Disney Company ("Disney"), had a longstanding, secret agreement to control their employees' compensation and mobility by not recruiting each other's technical employees, and by agreeing not to increase base salary offers in circumstances where an employee was considering both companies.

20.    The mutual anti-solicitation agreement, originally entered into between Lucasfilm Founder George Lucas, Pixar President Ed Catmull and Pixar CEO Steve Jobs in the mid-1980s, itself constituted a *per se* violation of the Sherman Antitrust Act between these two companies; but it was implemented, maintained and expanded to include as co-conspirators numerous other animation companies, including the other named Defendants, over a period of 25 years until it was brought to light by the Department of Justice's Antitrust Division in 2010 in the course of their investigation into similarly illegal mutual anti-solicitation agreements entered into between several of the world's largest technology companies based in Silicon Valley.

21.    In the original incarnation of the illegal agreement, Pixar agreed with Lucasfilm that (1) the two companies would not actively recruit or cold call one another's workers; (2) they would notify the other company when making an offer to an employee of the other company, if

ANTITRUST CLASS ACTION COMPLAINT

1   that employee applied for a job notwithstanding their agreement not to actively recruit one

2   another's workers; and (3)  the company making such an offer would not increase its offer if the

3   company currently employing the employee or worker made a counter-offer.   This anti-

4   solicitation agreement would eventually become widely adopted by other animation companies in

5   the visual effects and animation industry.

6          22.    Through the testimony of George Lucas and Ed Catmull, much of which has now

7   been made public by several media-related websites and through various court filings in the

8   related case styled *In re High Tech Empl. Antitrust Litigation*, Case No. 11-CV-02509-LHK ("*In*

9   *Re High Tech Antitrust*"), the identities of a number of other animation companies who became

10  co-conspirators in the mutual non-poaching and "non-raiding" scheme have now become known.

11  For example, Mr. Lucas and/or Mr. Catmull testified that Disney itself, beginning no later than

12  when it acquired Pixar in January 2006, became a party to the illegal mutual anti-solicitation and

13  wage-fixing agreements that had previously included Pixar and Lucasfilm.   These agreements

14  were not only bilateral agreements between Defendants; there was also a comprehensive over-

15  arching agreement between all of the conspirators and among all of the Defendants not to solicit

16  one another's employees.

17         23.    Emails written by Pixar's President and Co-founder Ed Catmull confirm that

18  Dreamworks Animation also agreed to participate in the secret anti-solicitation agreements at

19  issue that both constitute antitrust violations and illegally suppressed Class Members'

20  compensation.

21         24.    In February 2004, for example, Mr. Catmull sent an email to Steve Jobs, who was

22  then both the CEO of Pixar and Apple, complaining about Sony Pictures' attempts to recruit

23  Pixar's tech specialists by offering them higher pay: "Sony has approached all of our producers

24  trying to hire them. They all just ignored Sony." Mr. Catmull added: "We don't have a no raid

25  arrangement with Sony. We have set up one with ILM [Lucasfilm] and Dreamworks which has

26  worked quite well."  This is powerful evidence that, beginning no later than January 2004, both

27  Lucasfilm and Dreamworks had agreed to participate in a mutual anti-solicitation agreement with

28  Pixar.

ANTITRUST CLASS ACTION COMPLAINT

25.     Concerning Sony Pictures and Sony Animation ("Sony"), although they claimed to have initial reluctance to participate in the mutual anti-solicitation agreements, Mr. Catmull was able to bring them into the wage-fixing cartel.  In an email to Steve Jobs, Mr. Catmull states: "I probably should go down and meet with [Co-Founding Vice President of Sony Animation] Sandy [Rabins] and [Co-Founding Vice President of Sony Animation] Penny [Finkelman Cox] and Sony to reach some agreement. Our people are become [sic] really desirable and we need to nip this in the bud."

26.     Excerpts from Mr. Catmull's deposition in 2013 in the matter of *In Re High Tech Antitrust* also demonstrate that Mr. Catmull believed that he had been able to convince executives at Sony Animation to join the existing illegal conspiracy within the industry.  In his deposition, Mr. Catmull, who was then and is now the President of Walt Disney and Pixar Animation Studios, testified that, after he met with two Sony Animation executives, there was a general principle agreed upon that "going after everybody was just bad for everybody".  Noting that he "walked away believing that they would not do that anymore," he added: "I was wrong."  Mr. Catmull nevertheless clarified that, although Sony did not honor their gentleman's agreement, Mr. Catmull believed that Sony's executives had previously reached an understanding with him during that meeting in 2004 about not soliciting one another's employees.

27.     Another email produced during Mr. Catmull's deposition in the matter of *In Re High Tech Antitrust* confirmed that Mr. Catmull "flew down and met with them [the two Sony executives] around a year ago and asked them to quit calling our employees."  It is clear then that, at a minimum, Mr. Catmull had attempted in 2004 to obtain an agreement from executives at Sony Animation not to poach or solicit Pixar's employees and that Mr. Catmull felt that such an understanding had been reached and then subsequently breached by Sony's executives. Ultimately, Sony entered into anti-solicitation agreements with Pixar, Walt Disney Animation Studios and Digital Domain.

28.     In January 2006, The Walt Disney Company bought Pixar for $7.4 billion in an all-stock deal that turned Pixar's largest shareholder, Steve Jobs, into Disney's largest shareholder with a 7% stake in Disney and a seat on Disney's Board.  Following Disney's  acquisition of

ANTITRUST CLASS ACTION COMPLAINT

Pixar, the on-going mutual anti-solicitation conspiracy expanded to include new animation companies who became partners of Disney's, such as ImageMovers.  In 2007, for example, Ed Catmull, who was then a Disney executive, disclosed in an email to Disney's Chairman Dick Cook that Disney / Pixar was still maintaining its secret wage-fixing agreement with Dreamworks Animation, Lucasfilm and other animation studios, and that Disney's newest partner, Bob Zemeckis' animation company ImageMovers, was violating the industry's mutual anti-solicitation agreements by raiding employees from Dreamworks Animation.

29.    In his email to Mr. Cook, dated January 14, 2007, with the subject line filled in as, "Zemeckis", Mr. Catmull noted that Disney had a "serious problem brewing" because "…Zemeckis is setting up in San Rafael [and] has hired several people away from Dreamworks at a substantial salary increase …"  Mr. Catmull added, "I know that Zemeckis' company will not target Pixar, however, by offering higher salaries to grow at the rate they desire, people will hear about it and leave. We have avoided wars up in Norther [sic] California because all of the companies up here – Pixar, ILM [Lucasfilm], Dreamworks, and couple of smaller places – have conscientiously avoided raiding each other.   At the very least, I would like the kind of relationship that Pixar has with Disney in that people cannot be considered to move back and forth. However, even raiding other studios has very bad long term consequences".  The phrase "bad long term consequences" in Mr. Catmull's email was a thinly-veiled reference to the tendency of recruiting others' employees, in the absence of mutual anti-solicitation agreements, to drive up compensation and diminish corporate profits.

30.    Disney's Chairman Mr. Cook replied to Mr. Catmull's Janaury 14, 2007 email as follows: "I agree. We will reaffirm our position again.  As for Pixar or Disney, they absolutely know they are off limits."  By January 2007, at the urging of Disney and Pixar, and after Mr. Catmull met with Steve Starkey, one of the founders of ImageMovers, Defendant ImageMovers had entered into anti-solicitation agreements with Pixar, Walt Disney Animation Studios, Lucasfilm and DreamWorks, among others.  In fact, Disney's Senior Vice President of Human Resources Marjorie Randolph confirmed that she had gotten ImageMovers to agree to abide by the "rules" of the anti-solicitation agreement.

ANTITRUST CLASS ACTION COMPLAINT

31.     In another email in March 2007, Mr. Catmull once again emphasized the continued existence of Disney / Pixar's anti-solicitation deal with Dreamworks Animation when he wrote: "While we do not act to prevent people from moving between studios, we have an agreement with Dreamworks not to actively pursue each others [sic] employees.  I have certainly told our recruiters not to approach any Dreamworks employees.  Either you had not been informed or the policy has changed.  If the policy has changed then please let me know."  During his deposition in 2013 taken in the matter of *In Re High Tech Antitrust*, Mr. Catmull stated that his belief as to the existence of this agreement was based on conversations that he was aware of between Steve Jobs and Dreamworks co-founder Jeffrey Katzenberg.

32.     Beginning in 2007, Digital Domain's Head of Human Resources Lala Gavgavian and other senior personnel at Digital Domain specifically instructed employees not to cold call or otherwise solicit other Defendants' employees.  Indeed, if an employee of Lucasfilm/ILM, Dream Works or the Sony Defendants even contacted Digital Domain independently about applying for a job, the contact had to be reported to Mr. Gavgavian.

33.     The conspiracy among the Defendants was not limited to the anti-solicitation agreements; it also included activities that were designed to establish and fix compensation for workers.  The most senior personnel from the human resources and recruiting departments of Defendants met yearly to discuss job titles to be included in an industry compensation survey.  Specifically, at least once per year, some or all Defendants met in either Northern or Southern California to discuss job positions in common among their studios, in order to set the parameters of a compensation survey called the Croner Animation and Visual Effects Survey.  This was a survey of wage and salary ranges for the studios' technical or artistic positions, broken down by position and experience level.  However, Defendants used the opportunity presented by the Croner meeting to go further than their matching of job positions across companies; they discussed, agreed upon and set compensation for the ensuing year during meals, drinks and other social gatherings that they held outside of the official Croner meetings.  Defendant Digital Domain's Human Resources Department referred to the meeting as the annual "salary council", because it was attended by senior human resources and recruiting personnel and other studio

9

1    executives from Dream Works, Pixar, Lucasfilm/ILM, Disney, Digital Domain, ImageMovers

2    Digital and Sony Animation.

3        34.    Defendants, both through their top executives and their human resources and

4    recruiting departments, also communicated throughout the year to implement and enforce the

5    anti-solicitation and wage-fixing agreements while keeping them secret from their workers.

6    Senior human resources and recruiting personnel met for lunches, dinners, drinks and other

7    informal meetings at other times during the year as well, such as at the annual Siggraph

8    conference and FMX, the conference on animation, effects and games.  They even communicated

9    directly to ensure that the anti-solicitation agreements were not breached and compensation was

10   not raised to competitive levels.  For example, on November 17, 2006, Pixar's Vice President of

11   Human Resources, Lori McAdams, emailed a message to senior human resources personnel at

12   DreamWorks, Sony Pictures Imageworks, Lucasfilm, Walt Disney Animation Studios and others

13   asking them to share information about their salary increase budget for the following year and

14   sharing information about her own company's salary increase budget.  The purpose of these

15   meetings, emails and agreements was to suppress workers' and employees' compensation.

16       35.    During his deposition in 2013 taken in the matter of *In Re High Tech Antitrust*,

17   Mr. Catmull admitted that the purpose of the mutual anti-solicitation agreements was to keep

18   employees' compensation lower.  Specifically, he conceded as follows: "Well, them [other

19   animation studios] hiring a lot of people at much higher salaries would have a negative effect in

20   the long-term."  He added: "…  If the pay goes way up in an industry where the margins are

21   practically nonexistent, it will have a negative effect."   As George Lucas also admitted,

22   Defendants wanted to "keep the industry out of a 'normal industrial competitive situation.'"  He

23   stated: "I always-the rule we had, or the rule that I put down for everybody," was that "we cannot

24   get into a bidding war with other companies because we don't have the margins for that sort of

25   thing."

26       36.    Upon information and belief, the smaller animation companies alluded to in the

27   emails and deposition testimony set forth herein included Blue Sky Studios, Inc. and Rhythm &

28   Hues Studios, among others.  While working for Rhythm & Hues Studios, Plaintiff Cano was

10

1    informed by one of her managers that Rhythm & Hues Studios did not recruit technical

2    employees from other animation companies.  During her employ with Rhythm & Hues, that

3    company would receive calls from Sony, and once the Head of Production (Richard Hollander)

4    from Rhythm & Hues heard about this, he called Sony and ask it to stop soliciting Rhythm &

5    Hues employees and Sony complied with this request.  Rhythm & Hues filed for bankruptcy in

6    February 2013.

7        37.    All of the Defendants kept the agreements secret from their employees.  Only their

8    top executives and human resources and recruiting personnel involved in the conspiracy

9    communicated about the agreements orally or in emails among themselves, and they almost

10   always insisted that the agreements not be committed to writing.

11       38.    The United States Department of Justice's Antitrust Division (the "DOJ")

12   investigated the anti-solicitation agreement between Pixar and Lucasfilm and found that their

13   agreement was "facially anticompetitive" and constituted a *per se* violation of the Sherman Act.

14   As the DOJ explained, the agreement "eliminated significant forms of competition to attract

15   digital animators and, overall, substantially diminished competition to the detriment of the

16   affected employees who were likely deprived of competitively important information and access

17   to better job opportunities."  The DOJ concluded that the agreement "disrupted the normal price-

18   setting mechanisms that apply in the labor setting."  Defendants Pixar and Lucasfilm signed

19   settlements enjoining them from making such anti-solicitation agreements again.

20       39.    As set forth herein, all of the Defendants entered into the mutual anti-solicitation

21   agreements similar to the one determined to be illegal by the DOJ with the common interest and

22   intention to keep their employees' wage costs down, so that profits continued to rise or at least

23   not be undercut by rising salaries across the industry.  Disney's purchase of Pixar contributed to

24   an environment where these secret anti-solicitation deals could be expanded to include all of

25   Disney's partner companies within the world of animation and visual effects.  As a result,

26   Defendants engaged in anti-competitive behavior in advancement of a common and illegal goal of

27   profiting at the expense of competitive market-based salaries.

28

ANTITRUST CLASS ACTION COMPLAINT

3326665v1/102516

40.     Defendants also sought to restrain competition by agreeing to notify each other when an employee or worker from one Defendant applied for a position with another Defendant, and to limit counteroffers in such situations.  Thus, when an employee at one Defendant contacted a second Defendant and the second Defendant decided to make an offer, it would (a) notify the first Defendant, and (b) decline to increase its offer if the current employer outbid it.

41.     Defendants agreements unreasonably restrained trade in violation of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 et seq., and constituted unfair competition and unfair practices in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.  Plaintiff Georgia Cano, on her own behalf and on behalf of the Class defined herein, seeks to recover the difference between the compensation that Class Members were paid and what class members would have been paid in a competitive market, in the absence of Defendants' unlawful agreements.

## V.      HARM TO COMPETITION AND ANTITRUST INJURY

42.     Defendants are each in the business of creating visual effects and animation for motion pictures.  That business depends on the labor of thousands of skilled animators, graphic artists, software engineers and other technical and artistic workers.  Major animated films and films with significant visual effects require hundreds of workers with special training and millions of dollars of investment in the visual effects and animation.  Defendants create those effects and animation for movies produced by major motion picture studios such as Warner Bros. Pictures, 20th Century Fox, Universal Pictures, Paramount Pictures or Walt Disney Studios, or sometimes for their own movies.

43.     Visual effects and animation workers frequently obtain formal specialized schooling and training for their job duties and then gain invaluable experience and skills specific to the industry throughout their careers.  They develop and use specialized software and other tools unique to the industry.  They typically work on projects for discrete periods of time; such projects are often associated with a particular movie.

44.     Defendants conspired not to actively solicit each other's employees and workers and to fix their employees' compensation as part of one overarching conspiracy to suppress the

compensation of their employees and other class members.  The desired effect was obtained. Defendants' conspiracy suppressed Plaintiff's and the Class's compensation and restricted competition in the labor markets in which Plaintiff and the other members of the Class sold their services.  It did so through an overarching agreement concerning mutual anti-solicitation and the fixing of compensation for their workers.

45.   Concerning the anti-solicitation agreements, the use of recruiters to place cold calls to competitors' employees and workers and other forms of active solicitation have a significant beneficial impact for individual employees' compensation.   As understood by Defendants, active recruitment by rival employers often include enticing offers that exceed an employee's salary, thereby incentivizing the employee to leave his or her current employment in order to receive higher compensation or, alternatively, allowing the employee to negotiate increased compensation from his or her current employer.  Employees receiving cold calls and active solicitation offers often inform other employees of the offer(s) they received, spreading information about higher compensation that can similarly lead to movement for the purposes of higher compensation and/or negotiation by those other employees with their current employer or others for higher compensation.

46.   Active solicitation similarly affects compensation practices by employers. A firm that actively solicits competitors' employees or other workers will learn whether their offered compensation is enough to attract their competitors' employees, and may increase the offers to make their own company and its salaries more competitive in the marketplace.   Similarly, companies losing or at risk of losing employees to competitors engaged in active recruitment of employees or workers associated with their competitors may preemptively increase their employees' or workers' compensation in order to reduce their competitors' appeal.

47.   These information exchanges, through which information about higher salaries is exchanged between recruiters of one firm and employees of another, naturally tend to increase employee compensation.  The agreement between Defendants against active recruitment of each other's employees and workers made higher paying opportunities less transparent to workers and

ANTITRUST CLASS ACTION COMPLAINT

thus allowed employers to keep compensation lower than they would otherwise have been in the absence of such agreements.

48.     The compensation effects of cold calling and active recruitment are not limited to the particular individuals who receive cold calls, or to the particular individuals who would have received cold calls but for the anticompetitive agreements alleged herein. Instead, the effects of cold calling (and the effects of eliminating cold calling and other active recruitment, pursuant to the mutual non-poaching agreements) commonly impact all workers and Class Members at the Defendants.

49.     As described above, Defendants have themselves explained the purpose and intended impact of their conspiracy and in doing so, articulated the harm and injury caused by it to their workers.  George Lucas testified that the purpose of the mutual anti-solicitation agreement was to suppress compensation and keep the visual effects industry out of "a normal industrial competitive situation."  The mutual anti-solicitation agreement entered into by Defendants was explicitly intended to avoid "a bidding war with other companies because we don't have the margins for that sort of thing."  Lucasfilm noted in various internal emails that it and Pixar had "agreed that we want to avoid bidding wars."

50.     Similarly, Ed Catmull, the longtime Pixar President who now also oversees Walt Disney Animation Studios, was equally clear about the purpose of the conspiracy and the common injury it caused to visual effects and animation workers as well as to competition in the labor market for their services.  As noted, in a 2007 email, Mr. Catmull explained that he did not want players in the industry to hire one another's employees away because that frequently results in "a substantial salary increase [and] ... seriously messes up the pay structure."  As Mr. Catmull made clear during his deposition, the rationale for the anti-solicitation conspiracy was to prevent companies from making the pay structure "very high" because if other companies recruited away talent, "… they would pay higher salaries, it would be disruptive .... I was trying to prevent that from happening."

51.     When the wage-fixing was coupled with Defendants' agreements to prohibit counteroffers from the potential new employer, Defendants deprived their workers and employees

14

of the opportunity to have other employers bid to pay higher compensation for the particular employee's services.  Those agreements suppressed not only the compensation of the workers seeking new jobs or contracts, but also those of other existing workers by suppressing the wage ranges on which Defendants based all workers' pay.

52.   The effects and injuries caused by all of Defendants' agreements commonly impacted all employees at Defendants because Defendants valued internal equity, the idea that similarly situated employees should be compensated similarly across employees and workers at different levels in the organization.  Each Defendant established a pay structure to accomplish internal equity. Defendants fixed narrow wage and salary ranges for employees with similar job titles or classifications and similar levels of experience and maintained certain salary differentials between different positions within the hierarchy of their companies.  For example, Defendants ensured that lead effects animators earned more than assistant effects animators.

53.   At Lucasfilm, for example, internal equity was "always one of the considerations" in setting pay, according to its Director of Talent Acquisitions. Lucasfilm routinely reviewed employee salaries to "align the employee more appropriately in their salary range" and their "internal peer group."   At Lucasfilm, all new positions and out-of-cycle compensation adjustments presented to its compensation committee for approval were to be accompanied by "Peer Relationship" information regarding how the subject employee's (or candidate's) colleagues inside the company were compensated, and this factored heavily into committee decisions.

54.   Similarly, Pixar recruiters compared salaries of similar employees to ensure they were not "out of whack."  Pixar maintained "a consistent framework for evaluating the expected contribution of software engineers" and to justify adjusting salaries.  A Pixar official has stated: "[I]f someone feels like they're being paid more than someone I know who has more value, it raises a bit of a flag."

55.   Digital Domain also utilized a similar pay structure and adhered to its wage and salary ranges strictly. On information and belief, all other Defendants similarly employed a similar pay structure.

ANTITRUST CLASS ACTION COMPLAINT

56.     Defendants' efforts to maintain internal equity coupled with their anti-solicitation agreements ensured that their conspiracy caused the compensation of all their employees to be suppressed.

**VI.     INTERSTATE COMMERCE**

57.      During the Class Period, Defendants employed Plaintiff and other class members in California and numerous other states.

58.     States compete to attract visual effects and animation studios, leading employment in the industry to cross state lines.

59.     Both Defendants and Plaintiff and other class members view labor competition in the industry to be nationwide.   Defendants considered each other's compensation to be competitively relevant regardless of location, and many class members moved between states to pursue opportunities at studios.

60.     Defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

**VII.     CLASS ACTION ALLEGATIONS**

61.     Plaintiff brings this case on behalf of herself and as a class action under Federal Rule of Civil Procedure 23(b)(3) and (b)(2) on behalf of the following class:

> All persons who were employed by or worked as contractors for Pixar, DreamWorks Animation, Lucasfilm, Walt Disney Animation Studios, Walt Disney Feature Animation, Digital Domain, ImageMovers, ImageMovers Digital, Sony Pictures Animation, Sony Pictures Imageworks and/or Blue Sky Studios, Inc. in the United States at any time no later than 2004 through the conclusion of this action (the "Class Period"). Excluded from the Class are officers, directors, owners, senior executives, and Human Resources personnel of the Defendants.

62.     Plaintiff believes there are more than 50,000 current and former employees in the Class. Given Defendants' systemic failure to comply with United States and California laws outlined in this case, the members of the Class are so numerous that joinder of all members is impractical.  The Class is ascertainable from either Defendants' employment and hiring records or through self-identification in a claims process.

ANTITRUST CLASS ACTION COMPLAINT

63.     Plaintiff's claims are typical of the claims of the members of the Class, because all Class Members are or were employees or contractors who sustained damages arising out of (a) Defendants' illegal mutual anti-solicitation arrangements in violation of Section 1 of the Sherman Act that resulted in compensation suppression for all of the Class Members; and (b) Defendants' failure to follow fair business practices in violation of California law for those members of the Class who worked in California.

64.     Plaintiff will fairly and adequately represent the interests of the Class.  Plaintiff has no conflict of interest with any member of the Class.  Plaintiff has retained counsel competent and experienced in complex class action litigation with the resources and expertise necessary to litigate this case through to conclusion.

65.     Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to Plaintiff and Class Members are:

a.     Whether Defendants agreed not to actively recruit each other's employees and contractors in positions held by the Class Members;

b.     Whether Defendants agreed to fix compensation for the positions held by Class Members;

c.     Whether the mutual anti-solicitation agreements between Defendants were *per se* violations of the Sherman Act and/or Cartwright Act;

d.     Whether Defendants violated Section 1 of the Sherman Act by agreeing to not actively recruit or solicit one another's workers in positions held by Class Members;

e.     Whether Defendants violated Section 16702 of the Cartwright Act by agreeing to not actively recruit or solicit one another's workers in positions held by Class Members;

f.     Whether Defendants violated §17200 et seq. of the Business & Professions Code by agreeing not to actively recruit each other's workers in positions held by Class Members;

17

g. Whether Defendants fraudulently concealed their conduct and their illegal mutual anti-solicitation agreements;

h. Whether and the extent to which Defendants' conduct suppressed compensation below competitive levels;

i. Whether Plaintiff and the other class members suffered injury as a result of Defendants' agreements;

j. Whether any such injury constitutes antitrust injury; and

k. The measure of damages suffered by Plaintiff and the Class.

66. Class action treatment is superior to any alternative to ensure the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individuals would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. The Class members are readily identifiable from Defendants' employee rosters, payroll records or other company records.

67. Defendants' actions are generally applicable to the entire Class. Prosecution of separate actions by individual members of the Class creates the risk of inconsistent or varying adjudications of the issues presented herein, which, in turn, would establish incompatible standards of conduct for Defendants.

68. Because joinder of all members is impractical, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, the amounts at stake for many members of the Class, while substantial, may not be sufficient to enable them to maintain separate suits against Defendants.

**VIII.  STATUTE OF LIMITATIONS-DEFENDANTS' CONTINUING VIOLATION AND FRAUDULENT CONCEALMENT JUSTIFIES TOLLING**

69.     Defendants' conspiracy was a continuing violation in which Defendants repeatedly invaded Plaintiff's and Class Members' interests by adhering to, enforcing, and reaffirming the anticompetitive agreements described herein.  Defendants continue to discuss and agree on wage and salary ranges and prohibit active solicitation and cold calling of other Defendants' employees through the present day.

70.     Defendants communicated among themselves by phone and email and in in-person meetings in furtherance of the conspiracy as described in the allegations of this Complaint.

71.     Before late 2010 at the earliest, Plaintiff and the members of the Class had neither actual nor constructive knowledge of the pertinent facts constituting their claims for relief asserted herein.  Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of any conspiracy until at the earliest late 2010 when it was first revealed that an investigation by the DOJ into anti-solicitation agreements among high-tech companies included Pixar, a visual effects and animation company.  No visual effects or animation company had been mentioned previously as a part of the investigation.  This case is filed within four years to the date of the moment when it was first revealed that the DOJ investigation had unearthed that an animation company had also engaged in mutual anti-solicitation agreements with other similar companies.

72.     Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy among visual effects and animation companies to restrict competition for class members' services through anti-solicitation agreements, and to fix the compensation of class members.  In fact, Defendants had secret discussions and emails about the conspiracy and agreed not to discuss it publicly or in the presence of Class Members.

73.     Defendants' conspiracy was concealed and carried out in a manner specifically designed to avoid detection.  Outside top executives and certain human resources and recruiting personnel, Defendants concealed and kept secret the illicit anti-solicitation and wage-fixing

3326665v1/102516

agreements from class members. Defendants consciously avoided discussing the agreements in written documents that might be disseminated beyond the individuals involved in the conspiracy, to avoid creating evidence that might alert Plaintiff or other class members to the conspiracy's existence.

74. Defendants provided pretextual, incomplete or materially false and misleading explanations for hiring, recruiting and compensation decisions made pursuant to the conspiracy. Defendants' explanations for their conduct served only to cover up Defendants' conspiracy.

75. Defendants have attempted to create the false impression that their decisions are independent and that they were acting in accordance with the antitrust laws. For example, they and the Croner Company describe the Croner Survey as an "independent third party" survey purportedly falling within the DOJ's safe harbor, but Defendants used the occasion of Croner meetings to discuss and set wage and salary ranges for their employees in secret and in violation of the federal antitrust laws. Similarly, Defendants concealed the fact that they shared other salary and wage information directly with competitors by phone, email and other secret means.

76. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiff and the Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

**FIRST CLAIM FOR RELIEF**

**FOR VIOLATION OF SECTION ONE OF SHERMAN ACT, 15 U.S.C. § 1**

**(On Behalf of Plaintiff and the Class Against all Defendants, Except not Against Pixar, Lucasfilm, nor Disney)**

77. Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

78. Defendants, by and through their officers, directors, employees, agents or other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade, in violation of 15 U.S.C. § 1. Specifically, Defendants agreed to restrict competition for class members' services through anti-solicitation agreements, non-poaching agreements and agreements to fix the compensation of Class Members, all with the purpose and effect of

20

suppressing Class Members' compensation and restraining competition in the market for Class Members' services.

79. Defendants' conduct injured Class Members by lowering their compensation and depriving them of free and fair competition in the market for their services.

80. Defendants' agreements are per se violations of the Sherman Act.

81. Plaintiff seeks the relief set forth below and in this cause of action seeks such relief on behalf of herself and all Class Members against all defendants, except not against defendants Pixar, Lucasfilm, nor Disney.

**SECOND CLAIM FOR RELIEF**

**FOR VIOLATION OF SECTION ONE OF SHERMAN ACT, 15 U.S.C. § 1**

**(On Behalf of Plaintiff and the Class Against Pixar, Lucasfilm, and Disney, Except Excluding All Class Members who are also members of the Settlement Class under the September 20, 2103 Settlement Agreement with Pixar and Lucasfilm in *In re High-Tech Employee Antitrust Litigation*, 11-CV-2509 (N.D. Cal.))**

82. Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

83. Defendants, by and through their officers, directors, employees, agents or other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade, in violation of 15 U.S.C. § 1. Specifically, Defendants agreed to restrict competition for class members' services through anti-solicitation agreements, non-poaching agreements and agreements to fix the compensation of Class Members, all with the purpose and effect of suppressing Class Members' compensation and restraining competition in the market for Class Members' services.

84. Defendants' conduct injured Class Members by lowering their compensation and depriving them of free and fair competition in the market for their services.

85. Defendants' agreements are per se violations of the Sherman Act.

86. Plaintiff seeks the relief set forth below and in this cause of action seeks such relief on behalf of herself and all Class Members, with an exception provided for herein, against defendants Pixar, Lucasfilm, or Disney. This cause of action has not been brought on behalf of,

21

3326665v1/102516

1    and excludes, any Class Members that are also members of the Settlement Class as defined in the

2    September 20, 2013 Settlement Agreement with Pixar and Lucasfilm in *In re High-Tech*

3    *Employee Antitrust Litigation*, 11-CV-2509 (N.D. Cal.).

### THIRD CLAIM FOR RELIF

### VIOLATION OF THE CARTWRIGHT ACT
**[Cal. Bus. & Prof. Code §§16702, et seq.]**

**(On Behalf of Plaintiff and the Class Against all Defendants, Except not Against Pixar, Lucasfilm, nor Disney)**

8        87.    Plaintiff incorporates by reference the allegations in the above paragraphs as if

9    fully set forth herein.

10       88.    Defendants, by and through their officers, directors, employees, agents or other

11   representatives, have entered into an unlawful agreement, combination and conspiracy in restraint

12   of trade, in violation of California Business and Professions Code § 16720.   Specifically,

13   Defendants agreed to restrict competition for Class Members' services through mutual and

14   reciprocal anti-solicitation agreements, mutual and reciprocal non-poaching, and through

15   agreements to set and fix the wage and salary ranges of Class Members, all with the purpose and

16   effect of suppressing Class Members' compensation and restraining competition in the market for

17   class members' services.

18       89.    Defendants' conduct injured Plaintiff and other class members by lowering their

19   compensation and depriving them of free and fair competition in the market for their services.

20       90.    Plaintiff and other class members are "persons" within the meaning of the

21   Cartwright Act as defined in California Business and Professions Code § 16702.

22       91.    Defendants' agreements are per se violations of the Cartwright Act.

23       92.    Plaintiff seeks the relief set forth below and in this cause of action seeks such relief

24   on behalf of herself and all Class Members against all defendants, except not against defendants

25   Pixar, Lucasfilm, and Disney.

26

27

28

3326665v1/102516

**FOURTH CLAIM FOR RELIF**

**VIOLATION OF THE CARTWRIGHT ACT**
**[Cal. Bus. & Prof. Code §§16702, et seq.]**

**(On Behalf of Plaintiff and the Class Against Pixar, Lucasfilm, and Disney, Except Excluding All Class Members who are also members of the Settlement Class under the September 20, 2103 Settlement Agreement with Pixar and Lucasfilm in *In re High-Tech Employee Antitrust Litigation*, 11-CV-2509 (N.D. Cal.))**

93.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

94.     Defendants, by and through their officers, directors, employees, agents or other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade, in violation of California Business and Professions Code § 16720.   Specifically, Defendants agreed to restrict competition for Class Members' services through mutual and reciprocal anti-solicitation agreements, mutual and reciprocal non-poaching, and through agreements to set and fix the wage and salary ranges of Class Members, all with the purpose and effect of suppressing Class Members' compensation and restraining competition in the market for class members' services.

95.     Defendants' conduct injured Plaintiff and other class members by lowering their compensation and depriving them of free and fair competition in the market for their services.

96.     Plaintiff and other class members are "persons" within the meaning of the Cartwright Act as defined in California Business and Professions Code § 16702.

97.     Defendants' agreements are per se violations of the Cartwright Act.

98.     Plaintiff seeks the relief set forth below and in this cause of action seeks such relief on behalf of herself and all Class Members, with an exception provided for herein, against defendants Pixar, Lucasfilm, or Disney.   This cause of action has not been brought on behalf of, and excludes, any Class Members that are also members of the Settlement Class as defined in the September 20, 2013 Settlement Agreement with Pixar and Lucasfilm in *In re High-Tech Employee Antitrust Litigation*, 11-CV-2509 (N.D. Cal.).

3326665v1/102516

**FIFTH CLAIM FOR RELIEF**

**UNFAIR COMPETITION AND UNLAWFUL BUSINESS PRACTICE**
**[Cal. Bus. & Prof. Code §§ 17200 *et seq.*]**

**(On Behalf of Plaintiff and the Class Against all Defendants, Except not Against Pixar, Lucasfilm, nor Disney)**

99.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

100.     Section 17200 of the California Business & Professions Code prohibits any unlawful, unfair, or fraudulent business practices.

101.     Through its conspiracy and actions as alleged herein, Defendants' efforts to limit competition for and suppress compensation of their employees constituted unfair competition and unlawful and unfair business practices in violation of California Business and Professions Code §§ 17200 et seq.   Specifically, Defendants agreed to restrict competition for class members' services through anti-solicitation agreements and agreements to set and fix the wage and salary ranges of class members, all with the purpose and effect of suppressing class members' compensation and restraining competition in the market for class members' services.   Defendants' illegal conspiracy was substantially injurious to Plaintiff and the Class members.

102.     Defendants' acts were unfair, unlawful, and/or unconscionable, both in their own right and because they violated the Sherman Act and the Cartwright Act.

103.     Defendants' conduct injured Plaintiff and other class members by lowering their compensation and depriving them of free and fair competition in the market for their services, allowing Defendants to unlawfully retain money that otherwise would have been paid to Plaintiff and other class members.   Plaintiff and other class members are therefore persons who have suffered injury in fact and lost money or property as a result of the unfair competition under California Business and Professions Code § 17204.

104.     The harm to Plaintiff and members of the Class members in being denied payment for their services in the amount of higher compensation that they would have received in the absence of the conspiracy outweighs the utility, if any, of Defendants' illegal anti-solicitation agreements and, therefore, Defendants' actions described herein constitute an unfair business

1  practice or act within the meaning of section 17200 of the California Business and Professions

2  Code.

3       105.    Pursuant to California Business and Professions Code § 17203, disgorgement of

4  Defendants' unlawful gains is necessary to prevent the use or employment of Defendants' unfair

5  practices, and restitution to Plaintiff and other Class Members who resided or worked in

6  California is necessary to restore to them the money or property unfairly withheld from them.

7       106.    Plaintiff seeks the relief set forth below and in this cause of action seeks such relief

8  on behalf of herself and all Class Members against all defendants, except not against defendants

9  Pixar, Lucasfilm, and Disney.

10                      **SIXTH CLAIM FOR RELIEF**

11  **UNFAIR COMPETITION AND UNLAWFUL BUSINESS PRACTICE**
                    **[Cal. Bus. & Prof. Code §§ 17200 *et seq.*]**

12

13  **(On Behalf of Plaintiff and the Class Against Pixar, Lucasfilm, and Disney, Except Excluding All Class Members who are also members of the Settlement Class under the September 20, 2103 Settlement Agreement with Pixar and Lucasfilm in *In re High-Tech Employee Antitrust Litigation*, 11-CV-2509 (N.D. Cal.))**

14

15       107.    Plaintiff incorporates by reference the allegations in the above paragraphs as if

16  fully set forth herein.

17       108.    Section 17200 of the California Business & Professions Code prohibits any

18  unlawful, unfair, or fraudulent business practices.

19       109.    Through its conspiracy and actions as alleged herein, Defendants' efforts to limit

20  competition for and suppress compensation of their employees constituted unfair competition and

21  unlawful and unfair business practices in violation of California Business and Professions Code

22  §§ 17200 et seq.  Specifically, Defendants agreed to restrict competition for class members'

23  services through anti-solicitation agreements and agreements to set and fix the wage and salary

24  ranges of class members, all with the purpose and effect of suppressing class members'

25  compensation and restraining competition in the market for class members' services. Defendants'

26  illegal conspiracy was substantially injurious to Plaintiff and the Class members.

27       110.    Defendants' acts were unfair, unlawful, and/or unconscionable, both in their own

28  right and because they violated the Sherman Act and the Cartwright Act.

3326665v1/102516

111.   Defendants' conduct injured Plaintiff and other class members by lowering their compensation and depriving them of free and fair competition in the market for their services, allowing Defendants to unlawfully retain money that otherwise would have been paid to Plaintiff and other class members.   Plaintiff and other class members are therefore persons who have suffered injury in fact and lost money or property as a result of the unfair competition under California Business and Professions Code § 17204.

112.   The harm to Plaintiff and members of the Class members in being denied payment for their services in the amount of higher compensation that they would have received in the absence of the conspiracy outweighs the utility, if any, of Defendants' illegal anti-solicitation agreements and, therefore, Defendants' actions described herein constitute an unfair business practice or act within the meaning of section 17200 of the California Business and Professions Code.

113.   Pursuant to California Business and Professions Code § 17203, disgorgement of Defendants' unlawful gains is necessary to prevent the use or employment of Defendants' unfair practices, and restitution to Plaintiff and other Class Members who resided or worked in California is necessary to restore to them the money or property unfairly withheld from them.

114.   Plaintiff seeks the relief set forth below and in this cause of action seeks such relief on behalf of herself and all Class Members, with an exception provided for herein, against defendants Pixar, Lucasfilm, or Disney.   This cause of action has not been brought on behalf of, and excludes, any Class Members that are also members of the Settlement Class as defined in the September 20, 2013 Settlement Agreement with Pixar and Lucasfilm in *In re High-Tech Employee Antitrust Litigation*, 11-CV-2509 (N.D. Cal.).

## IX.   <u>JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

26

ANTITRUST CLASS ACTION COMPLAINT

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Georgia Cano, on behalf of herself and a class of all others similarly situated, requests that the Court enter an order or judgment against Defendants including the following:

a.  Certification of the class described herein pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.  Appointment of Plaintiff Georgia Cano as Class Representative and her counsel of record as Class Counsel;

c.  Compensatory damages in an amount to be proven at trial and trebled thereafter pursuant to 15 U.S.C. § 15;

d.  Pre-judgment and post-judgment interest as provided for by law or allowed in equity;

e.   The costs of bringing this suit, including reasonable attorneys' fees and expenses;

f.  A service award to compensate Plaintiff Georgia Cano for her efforts in pursuit of this litigation;

g.  Disgorgement and/or restitution pursuant to California Business and Professions Code § 17203; and

h.  All other relief to which Plaintiff Georgia Cano and the Class may be entitled at law or in equity including injunctive relief.

3326665v1/102516

1   | Dated:  September 17, 2014

STEVEN G. SKLAVER
KALPANA SRINIVASAN
MATTHEW R. BERRY
SUSMAN GODFREY LLP

JULIAN ARI HAMMOND (268489)
hammond.julian@gmail.com
HAMMONDLAW, PC
1180 S Beverly Dr Ste 610
Los Angeles, CA 90035
Phone: (310) 601-6766
Fax: (310) 295-2385

CRAIG ACKERMANN (229832)
cja@ackermanntilajef.com
ACKERMANN & TILAJEF PC
1180 S Beverly Dr Ste 610
Los Angeles, CA 90035
Phone: (310) 277-0614
Fax:  (310) 277-0635

By:   /s/ Steven G. Sklaver
        Steven G. Sklaver
        SUSMAN GODFREY LLP

Attorneys for Plaintiff Georgia Cano individually
and on behalf of all others similarly situated

28

3326665v1/102516